J-S08007-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| SAM MANNINO ENTERPRISES, INC. AND SAM MANNINO ENTERPRISES, LLC D/B/A INVESTORS FIRST CAPITAL | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| ANADARKO PETROLEUM CORPORATION, INC. | |
| Appellee | No. 1123 MDA 2020 |

Appeal from the Order Entered July 21, 2020
In the Court of Common Pleas of Centre County
Civil Division at No: 2016-4245

BEFORE:  STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.*

MEMORANDUM BY STABILE, J.:              **FILED: OCTOBER 29, 2021**

Appellants, Sam Mannino Enterprises, Inc. and Sam Mannino Enterprises LLC, d/b/a Investors First Capital, appeal from the July 21, 2020 order entering summary judgment in favor of Appellee, Andarko Petroleum Corporation, Inc ("Andarko").  We affirm.

The trial court found the following facts:

> This matter originates from [Andarko's] decision in 2015 to establish a rail project in Pennsylvania in order to ship waste water used in hydraulic fracturing ("fracking") to treatment facilities in Ohio, and subsequently return the water for reuse via the same method.  [Appellants] owned approximately thirty (30) tanker rail cars and sought to lease these tankers to [Andarko].  [Appellants'] contact with [Andarko] was Chad Bruinooge, and the two parties conducted  preliminary  negotiations  over  e-mail  and  phone

---

\* Former Justice specially assigned to the Superior Court.

beginning in spring of 2015. In the first correspondence between the parties in April 2015, Bruinooge explained to [Appellants] that rail leases are 'very difficult to sell to upper management' and that [Andarko] 'may not make a deal.' In a September 3, 2015, email, Bruinooge writes '…let's discuss the possibility of reaching a potential deal … we are very close to presenting this to upper management ….' In an email to [Appellants] dated October 5th, 2015, Bruinooge states 'I have received the go ahead to move forward setting up our rail program …' and that Bruinooge needed a formal proposal from [Appellants]. [Sam Mannino ("Mannino"), principal of Appellants], responded by stating he would provide a proposal as soon as possible, and offered to let Bruinooge inspect the rail cars. [Mannino] sent an abbreviated term sheet to Bruinooge, which [Mannino] later conceded in this litigation did not contain detail sufficient to make it a formal lease. [Mannino] corresponded with Andarko's local representative, Abbie Allison, who instructed [Mannino] that it needed to execute a Master Services Agreement ('MSA'), as all entities doing business were required to do, before proceeding with the lease agreement. On October 19, 2015, [Mannino] had an email exchange with Ms. Allison about the prospect of becoming an approved vendor in Andarko's system, and that [Mannino] knew becoming an approved vendor was an issue separate and apart from the lease agreement. On October 20th, 2015, Bruinooge traveled to Altoona to inspect the rail cars with [Mannino] and Larry Salone ('Salone'), during which Bruinooge allegedly stated to Salone that he would take the rail cars

Bruinooge stated in an email to Salone on October 22nd, 2015, '[o]nce all of the setup is done getting Sam [Mannino] into our system and able to do work **we will be able to execute the contract through the supply chain group.**' On November 9th, 2015, [Andarko] requested that [Appellants] execute the MSA; however, on November 10th [Appellants'] agent Keith McClellan emailed Ms. Allison and Erin Kee, requesting significant changes to the MSA. Bruinooge sent another email on December 3rd, stating that he now had permission to execute all contracts related to setting up [Andarko's] rail program. On December 14th, [Mannino] emailed Bruinooge, the relevant portion of the exchange occurred as follows:

> [t]he first group of approx. 20 cars is ready for you now and the balance will be ready in early January. However, **we need to get the agreements in place**

> **first. Please let me know how we can move this process forward so we can wrap this lease up before the end of the year.**
>
> [Appellants] submitted [their] version of the MSA on December 22nd, acknowledging that it was a separate agreement from the potential lease agreement. Mr. McClellan requested a combined version of both agreements, with the hope to finalize the deal that day, from [Andarko] on January 8th, 2016, and the parties acknowledge this was the last proposal exchanged by either party. On January 14th, 2016, Bruinooge responded to an email from [Mannino] stating that corporate management was uncomfortable with the negotiation positions taken by [Appellants], and that the commercial team would further evaluate [Mannino's] company before executing any lease contract. On March 8th, 2016, Bruinooge informed [Mannino] in an email that [Andarko] would not be engaging in business with [Appellants] at the present time, effectively ending all negotiations. In response to this rejection, [Mannino] emailed [Andarko's] agent Erin Kee, alleging that [Appellants] had spent approximately $200,000 refurbishing the rail cars for [Andarko], in addition to asserting claims for breach of contract and suggesting she review the emails and respond to him with a settlement offer. It is indisputable that the repair work referenced was related to damage the cars received while in the care of a prior lessee, Rocky Mountain Transportation, and that such repairs were necessary in order to lease the cars to anyone, including [Andarko]. It is also undisputed that [Appellants were the parties] who leased the rail cars in question to Rocky Mountain Transportation, and also filed litigation against the same to recover the cost of repairs for said damage. Ms. Kee responded to [Mannino] on March 10th, 2016, reiterating that an agreement was never reached, and that [Mannino] was aware that any final agreement would come from management and not Bruinooge or any other agent.

Trial Court Opinion, 7/17/20, at 1-4 (record citations omitted; emphasis in original).

Appellants filed their complaint on November 11, 2016. The trial court consolidated this case with Centre County docket number 2017-3105 (we dispose of the companion appeal at number 3105 at appellate docket number

1124 MDA 2020). Andarko answered Appellants' complaint on April 11, 2017. The parties proceeded through discovery and Andarko filed a motion for summary judgment on February 14, 2020. The trial court granted that motion on July 17, 2020. This timely appeal followed.

Appellants raise four assertions of error:

I. Did the trial court erred [sic] in finding that there was no issue of material fact as to whether an implied contract existed between the parties, where plain established facts showing there was a meeting of the minds on the key elements of a rail lease existed[?]

II. Did the court err in finding that there was no genuine issue of material fact as to whether [Appellants] reasonably relied upon a promise made by [Andarko]?

III. Did the court err in granting [Andarko's] motion for summary judgment when it did not view presented facts in a light most favorable to [Appellants]?

IV. Did the court err in finding that there was no issue of material fact as to whether Chad Bruinooge, agent of [Andarko], had authority to bind or obligate [Andarko], or whether [Andarko] acted reasonably upon relying on Chad Bruinooge's authority to obligate or bind [Andarko] to a contract with [Appellants]?

Appellants' Brief at 10.

Appellants' assertions of error challenge the trial court's entry of summary judgment. Rule 1035.2 of the Pennsylvania Rules of Civil Procedure authorizes a motion for summary judgment "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or

defense which could be established by additional discovery or expert report."

Pa.R.C.P. No. 1035.2.[1]

> When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment "where the right to such judgment is clear and free from all doubt. On appellate review, then,

>> an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo.* This means we need not defer to the determinations made by the lower tribunals.

> To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

**Summers v. Certainteed Corp.**, 997 A.2d 1152, 1159 (Pa. 2010) (internal citations and quotation marks omitted). An issue of fact is material where its resolution could affect the outcome of the case. **Pielago v. Orwig**, 151 A.3d 608, 610 (Pa. Super. 2016). The trial court should not permit an issue to go to the jury if the verdict would require "conjecture, surmise, guess or speculation." **Davis v. Wright**, 156 A.3d 1261, 1273 (Pa. Super. 2017). "A

---

[1] Appellant did not respond to the motion. The trial court disposed of Andarko's motion on the merits rather than enter summary judgment under Rule 1035.3(d) ("Summary judgment may be entered against a party who does not respond.").

plaintiff cannot survive summary judgment when mere speculation would be required for the jury to find in plaintiff's favor." *Id.*

First, Appellants argue there is a material dispute of fact as to whether the parties formed a contract implied in fact. "The consideration necessary to establish a valid contract, express or implied in fact, must be an act, a forbearance, or a return promise, bargained for and given in exchange for the promise." *Thomas v. R. J. Reynolds Tobacco Co.*, 38 A.2d 61, 63 (Pa. 1944).[2]

> A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings. Offer and acceptance need not be identifiable and the moment of formation need not be pinpointed. Restatement (Second) of Contracts § 22(2) (1981). Implied contracts ... arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract.

*Ingrassia Const. Co. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. 1984).

Regarding the evidence of mutual intention, we discern no error in the trial court's decision. As referenced above, Bruinooge sent an email on April 27, 2015—early in the negotiations—that final assent to a contract would come, if at all, from Andarko's corporate management, and that long term rail leases were "difficult to sell to upper management." Andarko's Motion for

---

[2] We note that *Thomas* addressed contracts implied in fact and the distinct doctrine of contracts implied in law. Appellants have alleged a contract implied in fact, and we confine our analysis accordingly. In their brief, Appellants appear to blur the distinction between these two doctrines. Appellant's Brief at 26.

- 6 -

Summary Judgment, 2/14/20, at Appendix p. 244. In a September 3, 2015, Bruinooge reiterated that he was "very close to presenting this option to upper management," thus confirming that upper management would make the final decision. *Id.* at Appendix p. 253. On October 5, 2015, Bruinooge emailed Mannino that he "received the go ahead to move forward setting up our rail program," and that he needed a "formal proposal" from Appellants. *Id.* at Appendix p. 293. On October 12, 2015, Bruinooge referred Mannino to Abbie Allison, Andarko's supply chain representative, to work with Mannino on setting up a Master Services Agreement ("MSA"), which was a precursor to entering a lease agreement. *Id.* at ¶ 52 and Appendix p. 309.

While Bruinooge personally inspected the rail cars on October 20, 2015, and allegedly said, "I'll take them," subsequent emails from Mannino clearly indicate his understanding that the parties' contract was not finalized. A November 10, 2015 email exchange between Allison and Mannino reveals Allision explaining the need for execution of the MSA prior to execution of the lease agreement, and Mannino responding that he would "start the process." *Id.* at Appendix, p. 363. Later that day, Appellants requested revisions to the MSA. *Id.* at Appendix, p. 366. Bruinooge emailed Mannino on November 21, 2015, to ask, "how are things progressing?" *Id.* at Appendix p. 391. In that same email, Bruinooge posed a question that once again confirmed that he was not the decision maker: "Whose shop is the paperwork in now?" *Id.* Bruinooge emailed Mannino on December 3, 2015, that he received

permission to execute contracts, and that Andarko would begin site preparation. *Id.* at Appendix p. 393. But the contracts were never executed. In Mannino's December 14, 2015 email to Bruinooge he asked what he could do to finalize the lease agreement before the end of the year. *Id.* at Appendix p. 395-96. The parties continued to exchange revised proposals until Bruinooge's March 8 2016 email to Mannino stating that Andarko's upper management would not proceed with the lease agreement. *Id.* at Appendix p. 433.

This record, construed in a light most favorable to Appellants as the nonmoving party, does not reflect the mutual intention necessary to establish an implied contract. Rather, the record demonstrates that the parties were working toward the formation of a written lease agreement and would proceed with Andarko's lease of railcars from Appellant only when the required MSA and written lease agreement were executed. Andarko terminated negotiations before the written agreements were executed, and therefore no contract was formed.[3] For the foregoing reasons, we conclude the trial court did not err in finding no material issue of fact as to the formation of an implied contract.

In its second argument, Appellants claim the trial court erred in granting summary judgment on their claim of promissory estoppel.

---

[3] Given our conclusion that no material issue of fact exists as to the formation of an implied contract, we need not address Andarko's reliance on the Statute of Frauds (13 Pa.C.S.A. § 2A201) to bar an implied contract for the lease of goods.

The doctrine of promissory estoppel permits a claimant to enforce a promise in the absence of consideration. To maintain a promissory estoppel action a claimant must aver the following elements: (1) the promisor made a promise that [it] should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.

***Sullivan v. Chartwell Inv. Partners, LP***, 873 A.2d 710, 717–18 (Pa. Super. 2005); ***see also***, Restatement (Second) of Contracts, § 90.

Appellants base this argument on emails from Bruinooge, and therefore they argue that Bruinooge was an agent with authority to bind Andarko with his promises.[4]

An agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel. […] Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. […].

The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. The creation of an agency relationship requires no special formalities. The existence of an agency relationship is a question of fact. The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence. In establishing agency, one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed.

[…]

---

[4] Appellants have blended their second and fourth arguments into one. We conduct our analysis accordingly.

> Where an agent exceeds his authority, and this is known or should be known by the principal, an agency may be created by apparent authority as to such acts; but in such instances the relation of the principal and agent is already established for some purposes.

*V-Tech Servs., Inc. v. St.*, 72 A.3d 270, 278–79 (Pa. Super. 2013). "Although a third party cannot rely on the apparent authority of an agent to bind a principal if he has knowledge of the limits of the agent's authority, without such actual knowledge, the third party must exercise only reasonable diligence to ascertain the agent's authority." *Bolus v. United Penn Bank*, 525 A.2d 1215, 1222 (Pa. Super. 1987).

Appellants' promissory estoppel claim rests on their assertions that, given Bruinooge's statement that Andarko would move forward with the lease agreement, Appellants did not pursue other opportunities to lease their tanker cars while the Andarko negotiations were ongoing. Appellants do not claim they received and turned down any requests from any other party to lease their rail cars, they simply did not pursue opportunities. As explained above, the parties formed no express or implied contract. Appellants were therefore free to pursue other leasing opportunities but received no specific proposals and chose not to pursue any in hope that the Andarko negotiations would come to fruition. Whether Appellants could have pursued and consummated a lease with a third party is a matter of speculation, and therefore not a basis upon which Appellants can avoid entry of summary judgment.

The record also reflects that Mannino emailed Andarko upon termination of negotiations that Appellant's spent almost $200,000.00 refurbishing rail cars in anticipation of the lease agreement. Appellant's Motion for Summary Judgment, 2/14/20, at ¶ 83 and Appendix p. 433. Mannino acknowledged at his deposition that the repairs to the rail cars needed to be done before they could be leased to any lessee. *Id.* at ¶ 84 and Appendix p 141. Mannino testified that the repairs were necessary due to damage caused by a prior lessee, with whom Appellants were in litigation. *Id.* at Appendix p. 149-52. In any event, the repairs were not a change in position in reliance on a promise from Bruinooge and/or Andarko.

Appellants' assertion of Bruinooge's agency, which rests on his apparent authority, also fails. An assertion of apparent authority fails where the party asserting agency had actual knowledge of the alleged agent's lack of authority. *Bolus*, 525 A.2d at 1222. As we explained in detail above, the record reflects that Appellants had actual knowledge from very early in the negotiations that approval of a deal would come from Andarko's corporate management and not Bruinooge. Even after Bruinooge wrote, on December 3, 2015, that he received permission to execute the contracts, Mannino's emails reveal his understanding that Bruinooge made no binding promises on behalf of Andarko.

To summarize the foregoing, Appellants' agency claim fails, as Appellants had actual knowledge of Bruinooge's lack of authority. Attendant

to that, there is nothing in the record to support a finding that Andarko made a promise on which Appellants could have reasonably relied. Further, there is no evidence that Appellants took action or refrained from taking action based on any promise or perceived promise from Andarko. The trial court did not err in finding no material issue of fact as to Appellants' promissory estoppel claim.

Appellants' remaining argument is that the trial court failed to view the facts in the light most favorable to them, as the nonmoving party. Appellants did not develop this argument in a specific section of their brief. Rather, it was interspersed throughout the brief. Likewise, we have explained throughout this memorandum our reasons for finding no trial court error.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/29/2021